THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO. 4:08-CV-99-FL

| KATHY R. ABERNATHY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff/Claimant, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the parties' cross motions for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). Claimant Kathy R. Abernathy ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of her applications for a period of disability and Disability Insurance Benefits ("DIB") payments. Claimant responded to Defendant's motion and the time for filing a reply has expired. Accordingly, the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this Court recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings and remanding the case to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

## STATEMENT OF THE CASE

Claimant filed an application for DIB on 18 January 2005, alleging disability beginning 19 July 2002.[1] (R. 13). Her claim was denied initially and upon reconsideration. (R. 51-52, 58-

---

[1] Claimant filed a previous application for disability insurance benefits on 7 November 2002, which was denied initially and upon reconsideration. (R. 13, 32-36, 64-66).

60). A hearing before the Administrative Law Judge ("ALJ") was held on 22 March 2006, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 834-75). On 12 August 2006, the ALJ issued a decision denying Claimant's request for benefits. (R. 11-20). On 14 June 2008, the Appeals Council denied Claimant's request for review. (R. 5-8). Claimant then filed a complaint in this Court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner...as to any fact, if supported by substantial evidence, shall be conclusive..." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla...and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained

2

his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," *i.e.*, currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform...past work or (5) any other work.

*Albright v. Commissioner of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(2).

In this case, Claimant alleges the following errors by the ALJ: (1) refusal to consider evidence generated subsequent to Claimant's date last insured ("DLI"); (2) failure to evaluate

3

properly Claimant's mental impairment; (3) failure to accord some weight to the opinion of Claimant's physician's assistant; and (4) improper assessment of Claimant's credibility. *See* Pl.'s Mem. in Supp. of Pl.'s Mot. for J. on the Pleadings at 7, 10-13. ("Pl.'s Mem.").

## FACTUAL HISTORY

### I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 15). Next, the ALJ determined Claimant had the following severe impairments: (1) depressive disorder with psychosis; (2) obesity; and (3) cocaine dependence. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* In reviewing Claimant's alleged mental impairment and applying the technique prescribed by the regulations, the ALJ found as follows: "[T]he claimant has the following mental limitations set forth in "Part B" of the mental listings: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. She has had no episodes of decompensation of extended duration." (R. 18).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform medium work,[2] to stand and walk six hours of an eight-hour workday, to frequently perform stooping and crouching and to perform simple, routine repetitive tasks in a

---

[2] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, she can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

4

non-production oriented environment with only occasional interpersonal contact with coworkers, supervisors or the public. (R. 16). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 16).

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a receptionist, fast food worker, test distributor and cook. (R. 18). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 19).

## II. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 51 years old and unemployed. (R. 840). Claimant attained an eleventh grade education and earned her General Educational Development credential. (R. 841). Claimant was last employed in 2002, working as a receptionist for a car dealership. (R. 843, 847-48). Claimant's past work experience also includes preparing and delivering pizzas, working as a cashier and cooking for various fast-food chains. (R. 842-46).

Claimant explained that she left her last position voluntarily because she was depressed, exhausted, unable to concentrate and complete tasks and experiencing crying spells. (R. 847-48). Claimant's mood swings oscillate between manic and depressive episodes a few times each week - a condition characterized as "rapid cycling." (R. 855-57). During the manic episodes, Claimant is capable of performing various household chores; however, she accomplishes nothing during the depressive episodes. (R. 857). Claimant has experienced also auditory and visual

hallucinations over the past four years. (R. 852). Claimant testified to feeling "okay" following her cardiac catheterization. (R. 867). Claimant takes medications for her mental impairment only, with the exception of thyroid medication. *Id.*

Claimant acknowledged that the administrative transcript contains medical records documenting a history of alcohol and illicit drug use. (R. 858-59). Claimant explained she stopped drinking alcohol in 1994. (R. 859, 864). With respect to cocaine, Claimant testified that she had been clean for approximately three years with the exception of a relapse in October 2005. (R. 859, 861). Claimant admitted to using cocaine on a regular basis in 2002 and 2003. (R. 860-61). Claimant's therapist was aware of Claimant's cocaine use and advised Claimant to discontinue its use. (R. 861-62). Claimant testified further that the therapist explained the effect cocaine possibly had on Claimant's depression, rapid cycling episodes and hallucinations. (R. 862). Claimant was unable to recall when she last used marijuana and she presently smokes up to a pack and a half of cigarettes per day. (R. 864).

Claimant's husband is primarily responsible for grocery shopping, although Claimant ventures out if only a few grocery items are needed. (R. 858). Claimant attends church but "not very often." (R. 858). Claimant engages in little socialization given the agitation experienced when around crowds. (R. 857). However, Claimant attends a psychological social rehabilitation program which helps participants improve their social skills. (R. 866). Claimant testified that she could probably perform a job that did not require interaction with others on a regular basis. (R. 866-67).

6

### III. Vocational Expert's Testimony at the Administrative Hearing

Kimberly Engler, Certified Vocational Expert, testified as a VE at the administrative hearing. (R. 62-63, 868-873). After the VE's testimony regarding Claimant's past work experience (R. 868), the ALJ posed the following hypothetical:

> If I were to limit the claimant to the performance of simple, routine, repetitive tasks in a low-stress, stable work setting that would be non-production, with little demand for extensive interpersonal interactions,...could she perform her past work?

(R. 869). The VE responded in the negative. The ALJ then asked if jobs were available for a claimant "limited to medium exertional level work in a nonproductive setting; performing simple, routine, repetitive tasks; with only occasional interaction [with others]." *Id.* The VE responded the individual could perform the following medium level unskilled positions and provided DOT classification citations along with the number of jobs available in the local and national economies: (1) cleaner (hospital) - DOT 323.687-010, 2,000 locally, 100,000 nationally; (2) cleaner II - DOT 919.687-014, 800 locally, 55,000 nationally; and (3) cleaner (laboratory equipment) - DOT 381.687-022, 1,000 locally, 50,000 nationally. *Id.* The VE stated that her testimony did not conflict with the DOT and explained further her interpretation of "occasional" interaction with others as "very little to up to a third of the day." (R. 872-73). When Claimant's counsel inquired as to the number of days a person may miss and yet maintain employment, the VE responded "one needs to not miss more than two days per month." (R. 871).

7

## DISCUSSION

### I. The ALJ erroneously disregarded the medical evidence created subsequent to Claimant's date last insured.

Claimant contends the ALJ erroneously disregarded the medical records created after 31 December 2004, Claimant's DLI. *See* Pl.'s Mem. at 7. In particular, Claimant states that much of the post-DLI medical evidence is highly reflective of Claimant's condition prior to the DLI, because this material sets forth limitations from impairments from which she suffered prior to 31 December 2004. As such, Claimant avers that the later evidence relates back to her disability status during the relevant time period; and accordingly, she contends it was reversible error for the ALJ to dismiss this evidence as irrelevant simply because it post-dated Claimant's DLI. *See id.* at 8.

The ALJ did not consider the medical records from 2005 and 2006, instead finding them irrelevant to Claimant's disability during the insured period (19 July 2002 through 31 December 2004). (R. 835). In particular, the ALJ found that "[a]ll of this voluminous evidence [from 2005 and 2006] which [Claimant has] submitted is irrelevant . . . . The DLI is December 31, 2004. So, all of [this] evidence...is not relevant to my consideration in this case." *Id.*; *see also id.* at 836 (reiterating that "evidence which has been submitted from [exhibit] 17F forward is not relevant to the establishment of disability prior to 2004"). The Court agrees with Claimant that the ALJ erred in disregarding the later medical records solely on the grounds that the records post-date the DLI. Medical evidence generated subsequent to a claimant's DLI may be relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the DLI. *See Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987) (medical evaluations made two years subsequent to expiration of insured status are not automatically barred from

8

consideration and may be relevant to prove a previous disability); *see also Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984). To simply exclude evidence on the grounds that it post-dates the DLI is error. Indeed, this evidence may demonstrate the severity of Claimant's impairments during the period of claimed disability. *Wooldridge*, 816 F.2d at 160; *see Camacho v. Comm'r of Soc. Sec.*, No.04-2400 (SEC), 2006 WL 286828, at *1 (D.P.R. Jan. 30, 2006) ("Medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability.") (citing *Wooldridge*, 816 F.2d at 160).

The consideration of evidence which post-dates a claimant's DLI is not unlike the analysis applied when the court considers evidence obtained subsequent to the ALJ's determination. *See Crowe v. Apfel*, 993 F. Supp. 697, 700 (S.D. Iowa 1998). That is, the evidence must be considered so long as it has a bearing upon whether the claimant was disabled during the relevant time period. *See id.* ("Post date last insured medical, psychological, and psychiatric evaluations are relevant to the extent they reflect upon the condition as of that date") (*citing Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)). However, unlike evidence submitted subsequent to the ALJ's determination, in the instant matter, the evidence was presented to the ALJ, who summarily dismissed it, leaving this Court in the position of determining the weight of the evidence.

This Court is aware of two unpublished cases wherein district courts have proceeded to weigh the post-DLI evidence after criticizing the ALJ's dismissal of such evidence solely on the grounds that it was generated after the DLI. *See Rankin v. Astrue*, No. 5:07CV00087, 2008 WL 892686, at *4 (W.D. Va. Mar. 31, 2008) (weighing relevance of post-DLI evidence despite

acknowledging the ALJ's failure to comment upon the substance of said evidence); *see also Abney v. Astrue*, 5:07-394-KKC, 2008 WL 2074011 at *8 n.1 (E.D. Ky. May 13, 2008) (explaining "it may have been more appropriate, as a procedural matter, for the ALJ" to have discussed the relevance of the post-DLI evidence and upon conducting a relevance analysis held error harmless). However, this Court finds the *Rankin* and *Abney* cases distinguishable from the instant matter. In *Rankin*, the court noted the existence of post-DLI evidence (generated within one and seven months of the DLI) documenting significant improvement of the claimant's condition and the lack of complaints by the claimant of any disabling symptoms. *See Rankin*, 2008 WL 892686, at *4. In *Abney*, the court noted the claimant's reliance on medical assessments by physicians who had no contact with claimant until almost two years after the claimant's DLI. *See Abney*, 2008 WL 2074011 at *7. Stating "[a]ny attempt [of these physicians] to opine about Plaintiff's limitations prior to [the DLI] would therefore be suspect even to begin with," the court found that neither source attempted to relate their assessments to the relevant time period. *Id.* In each of these cases, the evidence was found to be sufficiently overwhelming for the court to conclude that the ALJ's error was harmless. *See Rankin*, 2008 WL 892686, at *4; *see Abney*, 2008 WL 2074011, at *7.

This Court cannot reach the same conclusion in this case. Here, the evidence upon which Claimant relies (which concerns her mental impairment only) does not indicate significant improvement of Claimant's condition, as compared to *Rankin*, and unlike *Abney*, was generated by sources who had contact with Claimant within three months of the DLI. In particular, Claimant relies entirely on the opinions of Dawn Webb, a licensed clinical social worker and Sandra Reed, a certified physician's assistant with RiverStone Counseling and Personal

Development (which Claimant has visited periodically since at least 7 January 2000 (R. 462)),[3] to demonstrate the relevance of the post-DLI evidence.[4] *See* Pl.'s Mem. at 7, 9. A portion of the evidence from Ms. Webb and Ms. Reed was generated within three months of Claimant's DLI.

Claimant underwent therapy with Ms. Webb on a biweekly basis from 25 February 2005 through 1 December 2005. (R. 582-97, 824). During this period, Claimant's Global Assessment of Functioning ("GAF") score was assessed sixteen times, ranging from 40 to 50.[5] (R. 582-87, 824). In a medical source statement ("MSS") dated 21 March 2006, Ms. Webb indicated that Claimant's impairment or treatment would cause her to be absent from work more than three times per month. (R. 825). She noted further that independent of impairment from alcohol

---

[3] While Ms. Reed and Ms. Webb are neither medical experts nor "acceptable medical source[s]," *see* 20 C.F.R. § 404.1513(a), their opinions "may provide insight into the severity of Claimant's impairment and how it affects Claimant's ability to function." Soc. Sec. Rul. ("S.S.R.") 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *see also* 20 C.F.R. § 404.1513(d)(3) (defining "other sources" as including "social welfare agency personnel" and physicians' assistants). While finding that Ms. Reed's statement dated 11 April 2005 was "not entitled to weight given a treating physician or other physician since she is only a physician's assistant," the ALJ failed to indicate the weight accorded Ms. Reed's opinion. (R. 18).

[4] In fact, the remainder of the post-December 31, 2004 evidence is neither summarized nor cited by Claimant. This evidence includes medical visits and hospitalizations for hematuria back pain (R. 495, 600, 714-17), urinary tract infection (R. 503), right side pain accompanied by nausea and fever (R. 570), left lower abdominal pain (R. 600), chest pain with a diagnosis of unstable angina (R. 685, 694, 758) and arthroscopy of the left knee. However, with the exception of chest pain, Claimant listed none of these impairments on her disability application. *See* (R. 48, 58, 88). Moreover, Claimant did not mention these other impairments during her testimony, with the exception of stating that she felt "okay" following her cardiac catheterization. (R. 867). Rather, Claimant's testimony focused primarily on symptoms associated with her mental impairment.

[5] The GAF scale ranges from zero to one-hundred and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). A GAF of 40 indicates "[s]ome impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational or school functioning." *Id.*

11

and/or drug addiction, Claimant's ability to perform basic mental activities of work on a regular and continuing basis was markedly impaired. *Id.* Moreover, Ms. Webb noted Claimant had experienced marked limitations in activities of daily living and in maintaining social functioning, frequent deficiencies of concentration, persistence or pace and repeated episodes of deterioration. (R. 827). Ms. Webb indicated that the restrictions outlined in the MSS existed "at least since [28 February 2005]." (R. 828).

Similarly, Ms. Reed treated Claimant over the course of many sessions beginning in March 2005 and continuing through January 2006. (R. 770-802). In a statement dated 11 April 2005, M s. Reed indicated Claimant was being treated for major depression with psychotic disorders. (R. 442). She noted that Claimant continued to experience audio and visual hallucinations, that she was unable to maintain employment and that Claimant's prognosis was considered poor to fair. *Id.* Subsequently, on 10 October 2005, Claimant informed Ms. Reed of her use of crack cocaine in the last three weeks and "speed - yellow jackets" nearly every day of the past week. (R. 778). Claimant admitted further to using crack for the past 31 years with 6 months being the longest period of abstinence. *Id.* Ms. Reed stated that medication effectiveness was minimized by Claimant's drug use and attributed Claimant's medication non-compliance to her drug use. (R. 779). In January 2006, Ms. Reed documented Claimant's abstinence from illicit substances since October 2005 and observed that "[m]edication effectiveness noted to be controlling symptoms fairly well...." (R. 770). However, on 10 March 2006, Ms. Reed characterized Claimant's "mood/affect" as "abnormal" and stated diagnostic possibilities include "Major Depression, severe; Anxiety DO; Stress DO; Bipolar DO R/O." (R.

769). Ms. Reed noted further that Claimant stated she was not doing very well and that she pretended to use drugs because she was bored. *Id.*

The evidence from Ms. Webb and Ms. Reed describe symptoms similar to those complained of by Claimant prior to the expiration of her insured status. Moreover, the opinions of both Ms. Webb and Ms. Reed "may provide insight into the severity of [Claimant's] impairment(s) and how it affects [her] ability to function." S.S.R. 06-03p, 2006 WL 2329939, at *2; *see Bowman v. Astrue*, 511 F.3d 1270, 1274-1275 (10th Cir. 2008) (explaining "[o]pinions [from physician assistants and licensed clinical social workers] . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file"). However, in this case, the ALJ did not expressly weigh the opinions of either. (R. 18). Finally, the review of the medical records would require this Court to weigh, for the first time, evidence that was before the ALJ yet summarily rejected. *See Craig*, 76 F.3d at 589 (explaining a court is not entitled to substitute its judgment for that of the ALJ); *see also Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984) (explaining "unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational") (quoting *Arnold*, 567 F.2d at 259); *Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. Accordingly, this Court recommends this case be remanded to the ALJ for consideration of the post-DLI evidence. Because this Court finds that remand on this issue will affect the remaining issues raised by Claimant, it does not address these arguments.

## CONCLUSION

For the reasons stated above, this Court RECOMMENDS Claimant's Motion for Judgment on the Pleadings be GRANTED, Defendant's Motion for Judgment on the Pleadings be DENIED and the case be REMANDED to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 5th of May, 2009.

Robert B. Jones, Jr.
United States Magistrate Judge